[Civil No. 4469.    Filed April 6, 1942.]

[124 Pac. (2d) 320.]

DAILY MINES COMPANY, a Corporation, Appellant, v. CATALINA CONSOLIDATED COPPER COMPANY, a Corporation, Appellee.

Mr. Tom K. Richey, and Messrs. Baker & Whitney, for Appellant.

Messrs. Conner & Jones for Appellee.

LOCKWOOD, C. J.—Jack Martin brought suit against Daily Mines Company, a corporation, to recover on a note for $1,500, dated November 13, 1937, executed by it in favor of Catalina Consolidated Copper Company, and by the latter assigned to Martin. Daily Mines Company answered, and asked that the Catalina Consolidated Copper Company be brought in as a third-party defendant, and then, in a third-party complaint, set up two defenses to the note. The first was that Martin was not an innocent holder for value, and the second was that the note was usurious, and in the complaint it asked to recover from the Catalina Consolidated Copper Company some $23,000, which it claimed had been paid usuriously to the latter upon the note, and that the note be cancelled. Hereafter we shall refer to the Daily Mines Company as plaintiff and to the Catalina Consolidated Copper Company as defendant, as the issue on the whole case is really between them.

Defendant moved to dismiss the third-party complaint, and the motion was granted, with ten days leave to plaintiff to amend. After amendment a motion to dismiss the amended complaint was made. The

court considered that the motion was well taken, but offered leave to plaintiff to amend again. The latter, however, preferred to stand upon its complaint, and the motion was granted. Thereafter the case came before us in the usual manner.

The question is whether the amended complaint stated a cause of action against defendant. It is too long to set forth in full, and we state its substance in chronological narrative form, quoting directly only as necessary.

Plaintiff owned some sixteen patented mining claims in Pima county, which had been more or less developed as a mine, while one Meade Clyne had taken an option and lease on fifteen patented mining claims and four unpatented millsites belonging to the Phelps Dodge Corporation, and adjoining plaintiff's property, by the terms of which he was entitled to mine and ship ores from the optioned claims, upon paying to the owner a royalty of 10% of the net metal value of the bullion produced. Plaintiff and Clyne desired to operate the respective properties together as a unit, and, therefore, on April 28, 1937, entered into an agreement, the substance of which was that Clyne was to organize a corporation and assign to that corporation his option upon the Phelps Dodge property, in return for 80,000 shares of the capital stock of the corporation. He also agreed to lend to the corporation such sum, not exceeding $36,000, as was needed as preliminary working capital for the equipping of the mill to handle the ores of the two properties. This loan was to be without interest up to April 1, 1938, but thereafter to bear interest at 6% per annum. It was also to be repaid to Clyne before any dividends or profits should be distributed by the corporation. Plaintiff agreed to convey to the corporation to be organized its sixteen mining claims, upon certain conditions. Clyne, or the corporation to be organized, was to enter upon the claims

of plaintiff, and operate the same, constructing a mill for the treatment of ores from both groups of claims. The agreement then provided as follows:

" . . . The party of the second part, until said corporation to be organized has been organized and qualified to do business, and thereafter said corporation to be organized, shall retain as his own or as its own, without the payment of any royalty to the party of the first part, all of the proceeds of any ores taken from the claims of the party of the first part incidental to the running of any tunnels for development purposes on the claims of the party of the first part. If any stoping be done on the claims of the party of the first part, then the party of the second part or said corporation to be organized, as the case may be, shall retain all of the proceeds thereof save and except that 10% of the net metal value thereof shall be deposited in escrow with Southern Arizona Bank & Trust Company, Tucson, Arizona, . . . "

This 10% was to become the property of defendant if, as and when plaintiff's claims were conveyed to it; if the agreement was cancelled by plaintiff, it was to belong to the latter. Until defendant secured title to all the claims, plaintiff was to receive 20% of the net profits of the joint adventure after Clyne's advance was repaid. If and when title to the Phelps Dodge properties and the properties of plaintiff were conveyed to defendant, plaintiff was to receive 20,000 shares of defendant's stock, and thereafter any profits from the operation of defendant were to go, 20% to plaintiff and 80% to Clyne, being their proportions of the shares of stock of defendant. It was further provided that if the Phelps Dodge option was not exercised, plaintiff should retain its property, plus the 10% escrow funds aforesaid, while defendant should have the right to remove the mill and equipment used for the mining operations. There were a number of other conditions of the agreement, but these are the essential ones. Summed up, if the whole deal was

finally consummated, plaintiff got 20% and Clyne 80%, after Clyne was repaid his advance. If it fell through before title to the properties passed to defendant, plaintiff got 10% of the value of the ore *stoped* from its properties, plus 20% of any net profit of the adventure, after repayment of Clyne's advances, to that time, and defendant, which would then mean Clyne, got everything else. The corporation provided for was duly organized, being defendant herein, and mining operations were begun upon the properties.

Plaintiff was indebted to one Freda O. Christmann, in the sum of $1,500, which it did not have available for payment when due. On August 12, 1937, plaintiff and defendant entered into a supplemental agreement, which set up the provisions of the agreement of April 28 in regard to the mining operations to be had on plaintiff's claims, including the one referring to the payment of 10% of the net metal value of ores taken from plaintiff's claims by stoping, and modified such agreement in the following language:

"The party of the first part hereto does hereby waive, from the date hereof up to and including the 30th day of November, 1937, the requirement of said agreement of April 28, 1937, as to the depositing in escrow of ten per cent of the net metal value of any ores taken from the claims of the party of the first part by the party of the second part by means of stoping, and agrees that from the date hereof up to and including said 30th day of November, 1937, the party of the second part may take from the claims of the party of the first part (including any and all dumps now on the claims of the party of the first part) by any legitimate mining methods, including stoping, such ores as it may see fit and mine and mill and ship and dispose of the same and retain as its own all of the proceeds thereof, free and clear of any claim therein or thereto by the party of the first part. Beginning December 1, 1937, this waiver of said require-

ment of said agreement of April 28, 1937, shall be of no further force or effect and the proceeds of any ores thereafter taken from the claims of the party of the first part by stoping shall be applied as in said agreement of April 28, 1937, set forth and specified.

"The party of the second part agrees that, if so requested by the party of the first part, it will lend to the party of the first part, on the promissory note of the party of the first part, payable April 1, 1938, without interest prior to April 1, 1938 and bearing interest from and after April 1, 1938, at the rate of six per cent per annum, the sum of $1,500.00, to be used by the party of the first part for the purpose of making said payment of $1,500.00 to Mrs. Freda O. Christmann, due and payable November 13, 1937, in return for which payment the present interests of Mrs. Christmann in the claims of the party of the first part is to be conveyed to the party of the first part."

Pursuant to such agreement, plaintiff on October 30, 1937, requested defendant to loan it the $1,500 therein provided for, which loan was then made by defendant to plaintiff, and the note sued upon by Martin delivered to defendant.

The complaint then alleges as follows:

"V. Alleges that said Catalina Consolidated Copper Company and plaintiff Jack B. Martin, as its president, well knew and intended that by said exaction and demand and the execution of said agreement that said Catalina Consolidated Copper Company would take and receive as a consideration for said loan of $1500.00 and the use thereof a sum or value for said loan greatly in excess of eight dollars on one hundred dollars for one year; that said agreement was obtained by duress, was and is usurious, and was secured by said Catalina Consolidated Copper Company for the purpose of evading the usury laws of the State of Arizona and for covering up a violation thereof.

"          .     .     .     .     .     .     .     .     .     .

"VII. Alleges that under and by virtue of said agreement, 'Exhibit B,' and between the 12th day of August, 1937, and November 30, 1937, said Catalina

Consolidated Copper Company took, shipped and disposed of ores from said mining claims of this Defendant and Third-party Plaintiff of the value of more than $30,000.00 and took and received therefor the sum and amount of $24,218.91 as and for the consideration for the said loan of said $1500.00 to this Defendant and Third-party Plaintiff, and retained and still retains said sum.''

and concludes with a prayer for relief for cancellation of the note and recovery of the amount of $24,218.91 above set forth, less the amount still due on the note.

The question is whether plaintiff's amended complaint sets forth a usurious transaction. Under the original agreement, the defendant, as Clyne's successor in interest, was entitled to operate plaintiff's claims, to retain all the proceeds of any ores extracted by development of the property, and 90% of any ore extracted by stoping. Apparently there were some ores lying upon the dumps of these claims. They were not specifically referred to in the original agreement, and there was considerable discussion during the course of the argument in this court as to whether defendant was entitled to the full proceeds of such ore, like that obtained by development work, or merely 90% thereof, as with the ores obtained by stoping, or could reduce them at all. We think, however, it is unnecessary to determine this, as it is not material to the issue presented by the present appeal.

The agreement of August 12 was not a loan, but was merely a promise by defendant that if plaintiff desired a loan at a future date, it would make such loan on the terms set forth in the agreement. The actual making of the loan was purely optional with plaintiff. Had it secured the $1,500 it desired from some other source, as the agreement on its face clearly contemplated might be possible, though not probable, no one would claim the agreement would be usurious, for no loan would have existed. Nevertheless there

would have been a valid consideration for the waiver of plaintiff's 10% royalty, to-wit: defendant's promise to hold itself in readiness to make the loan, and thus tying up that amount of its funds until plaintiff decided whether to exercise its option. *Fussell* v. *Daniel*, 156 Eng. Reprint 570.

But, says plaintiff, no matter what the form of the agreement, if it appears on the whole case that the intent and effect thereof was to violate the usury laws, the transaction will be held to be usurious. This is very true, but where this does not appear on the face of the agreement, there must be proper pleadings and proof to aid it.

There is an allegation in the complaint that defendant knew, as a result of this waiver, it would receive a greater sum for the loan of the $1,500 than the legal interest allowed by law, and that it was secured for the purpose of evading the usury laws of the State of Arizona, and covering up a violation thereof. There is nothing in the pleadings, however, showing that the royalty thus to be waived had any definite or particular value. A transaction of this kind is not usurious unless it is alleged and proved that its effect was necessarily such that it could be anticipated with reasonable certainty that the result was bound to be usurious. Restatement of Contracts, § 527.

Obviously, from its very terms, the waiver was of future and speculative value only, depending upon whether defendant did actually exercise its option of stoping ore and reducing it and that already on the dumps, and the net value of such ore. In order, therefore, that the transaction be usurious, it is necessary that there be some allegation that there actually was received by defendant, as a result of the agreement, an amount which would constitute a usurious transaction. The only allegation of the complaint which bears on the amount received by defendant is para-

graph VII above set forth. It will be observed that this merely states that defendant too, shipped and disposed of ores from the mining claims of plaintiff and received therefrom the sum of $24,218.91.

It must be remembered that defendant was entitled, by the original agreement, to receive the value of all the ores extracted in development work, without any deduction for royalty. It is, of course, true that the allegations of any complaint must be taken most strongly against the pleader, and for aught that the third-party complaint herein sets forth, every bit of the ore referred to in paragraph VII might have been extracted through development work, in which case it was the unquestioned property of defendant, without royalty, by virtue of the original agreement. There is, therefore, no allegation in the complaint that anything has been received by defendant, or that will necessarily be received by defendant, under the terms of the agreement of August 12, which renders the transaction usurious.

The trial court pointed out to plaintiff the defect in the complaint, and there was no legitimate excuse set forth for its failure to make this allegation. No request was made for leave to amend by showing specifically what, if any, sums defendant received by virtue of the waiver of the 10% royalty. Such being the case, plaintiff failed to allege that, in the language of section 36–102, Arizona Code 1939, defendant did "directly or indirectly take or receive . . . any greater value for the loan or forbearance of any money" than that provided by law.

The action of the trial court is affirmed in all things.

McALISTER and ROSS, JJ., concur.